# STATE ex rel. WILLIAM H. MASON v. CONSUMERS POWER COMPANY.[1]

October 25, 1912.

Nos. 17,757—(9).

**Public service corporation — discrimination between customers.**

A public service corporation, which has accepted a franchise from a city authorizing it to operate therein, is bound by the implication of the law to make no unreasonable discrimination between those to whom service is or is not to be furnished; that is, it must not be partial and must serve all alike who are similarly circumstanced with reference to its system, or who are members of any class which it has undertaken or is otherwise bound to serve.

**Public service corporation — eminent domain.**

A corporation organized to supply electric service to the cities of the state and the inhabitants of such cities, is a public service corporation within the rule above announced; especially in view of R. L. 1905, § 2927, giving such a corporation the right to use the highways of the state for the purpose of constructing its lines, and of the fact that such service is a public service in aid of which the power of eminent domain may be exercised.

**Mandamus — evidence.**

Evidence in mandamus to compel an electric light company to furnish electric service to relator's house considered, and *held* to show that such house was situated within a zone of service already established by the respondent, and was therefore prima facie entitled to the same service furnished to other houses within the same zone.

**Making connection with customer's property.**

The court will judicially notice that when an application is made to a public service corporation for a public service such as water, gas, electric light or power, or telephone service, certain things have to be done in order

[1] Reported in 137 N. W. 1104.

119 M.—15.

to connect the applicant's premises with the company's system, and that the company, and not the applicant, usually attends to such matters, except in so far as they may be controlled by special rules and regulations applicable to the particular service.

### Same — by stringing wires in streets and alleys.

The court will judicially notice that cities are divided by streets and alleys into blocks and subdivisions of blocks; that public service corporations using wires for the distribution of the service supplied by them, such as telephone and electric-light service, customarily set poles in the streets and alleys and string wires along and across the same; that such wires frequently cross the streets and alleys; that many persons are served by such wires so strung above and across the streets and alleys; and when the consent of the city is necessary in order that the service company may lawfully set such poles and string such wires as may be necessary to carry the service to the persons so served and to be served, the company, and not its patrons or applicants for service, usually attends to the obtaining of the necessary consent of the city to the use of the streets, by application to the council or otherwise.

### Presumption as to custom — applicant's right to writ of mandamus — burden of proof.

In the absence, therefore, of evidence of a contrary custom, in mandamus proceedings to compel the furnishing of service, it will be presumed that the respondent, an electric-light company, follows the usual custom and itself performs the details incident to the connection of its lines with the premises of applicants for service; and hence where it appears that an applicant for service, whose house is in an established service zone, has made proper application and demand upon the respondent and has his house equipped to receive the service, his right to the writ is prima facie established; the burden of establishing a contrary custom being upon the respondent, as is also the burden of establishing any defense predicated upon its inability, through physical, legal, financial, or other obstacles, to furnish the service demanded.

### Unreasonable discrimination.

It is unreasonable discrimination for an electric-light company to require an applicant for service to procure for it a right of way to his premises, when such condition is not imposed upon other applicants and patrons.

### Condition in franchise.

A provision in an ordinance granting a franchise to an electric-light company, that the city should not require the company to make "extensions" except upon certain conditions, *held* not to affect the right of a resident in an established service zone to invoke the aid of the courts to compel the company to connect his premises with its line.

**Same.**

Such provision held not to affect the mutual rights and obligations of the company and the individual residents of an established service zone.

**Mandamus the proper remedy.**

. Mandamus is the proper remedy to compel a public service corporation to furnish service to an individual applicant therefor.

**Tenor of writ.**

The mandate of a writ of mandamus to compel an electric-light company to furnish electric service to the relator, should, under the established facts herein, be merely that the respondent must furnish such service, without specifying the details or manner in which such duty is performed.

Upon petition of William H. Mason the district court for Ramsey county issued its alternative writ of mandamus, directed to the Consumers Power Company, commanding it to connect relator's dwelling house with its service wires constructed in the vicinity of the house; that such connection be made through the alley in block 10 of Macalester Park, or by such other authorized route as respondent might select, and that respondent furnish and supply to relator electric current sufficient to light his house in the usual and ordinary manner in like houses, or show cause why it had not done so. The answer alleged that the distance from the property occupied by relator to the nearest pole connected with the electric light wires belonging to respondent was more than three hundred feet, exclusive of street crossings; that the pole was located in the alley in block 10 of Macalester Park and was the only point from which respondent could string wires and convey electricity to the house of relator; that, in order to reach the house of relator, the wires would of necessity cross and be strung over Amherst street, and a pole would of necessity be placed therein; that respondent had no proper permission or authority from the common council of the city of St. Paul for the erection of such pole or for the stringing of wires upon or across Amherst street, and that relator had made no application to the common council for such order, and no order had been made by the common council directing respondent to continue its lines in conformity with section 8 of the ordinance.

The matter was tried before Hallam, J., who made findings and as

conclusion of law quashed the writ. From an order overruling relator's motion for judgment on the findings or for amendment of the findings and conclusion of law, and from an order denying a motion for a new trial, he appealed. Reversed.

*William H. Mason,* pro se.

*Denegre & McDermott,* for respondent.

PHILIP E. BROWN, J.

Mandamus to compel the respondent to furnish electric service to the relator's residence in the city of St. Paul. An alternative writ was issued but, after hearing had and upon findings made, such writ was quashed; whereupon from an order denying the relator's motion for a new trial, prayed for on the grounds that the court erred in overruling the relator's motion for judgment upon the findings or for amended findings and judgment thereon, the relator appealed.

1. The respondent is, and during all the times hereinafter mentioned has been, a corporation duly organized and existing under the laws of this state, with power to generate, distribute, and supply electric current for light, heat and power, and other purposes, to the cities of the state and the inhabitants of such cities, and by virtue of certain ordinances is and, at all times material to the issues involved in this case, has been authorized to carry on its said business in the city of St. Paul. Being a corporation organized and empowered to perform a public service, and having accepted a franchise from the city authorizing it to operate therein, it is bound by the implication of the law to make no unreasonable discrimination between those to whom the said service is to be furnished; that is, it must not be partial and must serve alike all who are similarly circumstanced with reference to its system or who are members of any class to which it has undertaken or is otherwise bound to furnish service. State v. Board of Water & Light Commrs. of Duluth, 105 Minn. 472, 117 N. W. 827; Minnesota Canal & Power Co. v. Koochiching Co. 97 Minn. 429, 450, 107 N. W. 405.

This is the rule almost universally applied to telephone companies (State v. Board of Water & Light Commrs. of Duluth, supra; State

v. Citizens, 61 S. C. 83, 85 Am. St. 870, 55 L.R.A. 139; Chesapeake
v. Baltimore, 66 Md. 399, 59 Am. Rep. 167; Central v. Falley, 118
Ind. 194, 10 Am. St. 114, and note), water companies (Haugen v.
Albina, 21 Ore. 411, 14 L.R.A. 424), gas companies (State v. Board
of Water & Light Commrs. of Duluth, supra; City v. Rushville,
132 Ind. 575, 15 L.R.A. 321, and note), and electric-light com-
panies (Snell v. Clinton, 196 Ill. 626; Cincinnati v. Village, 57
Oh. St. 336, 41 L.R.A. 422; Schmitt v. Edison, 110 N. Y. Supp.
44); and while the rule has never been applied in this state speci-
fically to electric-light companies, we feel no hesitancy in applying
it to such companies, especially in view of R. L. 1905, § 2927,
giving them the right to use the highways of the state for the purpose
of constructing their lines, etc., and of the decision in Minnesota
Canal & Power Co. v. Koochiching Co., supra, and of the fact that
such service is a public service in aid of which the power of eminent
domain may be exercised. Moreover, section 4 of the ordinance by
which the respondent is authorized to exercise its corporate fran-
chises in the city of St. Paul provides that the respondent "shall at
all times during the life of this franchise (the franchise to operate
in the city), furnish and supply electricity to all customers and appli-
cants without discrimination and at reasonable rates," and "shall at
all times during the life of this franchise, use and exert every rea-
sonable effort to continuously furnish an ample supply of electricity
to all of its patrons along its entire system and all enlargements and
extensions thereof."

Unquestionably, then, it was, and is, the respondent's duty to
supply, without discrimination, electric service to all citizens of St.
Paul whose property is so situated as reasonably to entitle them
thereto under the ordinance, and under the general law applicable
to public service corporations, and to refrain from unjust discrimi-
nation between such citizens. So the next question is: Does the rela-
tor come within this class? He claims that he does, on the ground
that he is a member of a class rendered determinate by the respond-
ent's own acts, that is, that his residence is within a service zone
already established by the respondent; his ultimate claim of a vio-
lation of a legal duty due him from the respondent being that it is

unjust discrimination to deny him the service. Prima facie, at least, we think that this claim is amply sustained by the findings, when the latter are taken together with the undisputed evidence, for it appears that the relator's premises are literally surrounded by residences which are served by the respondent. His residence is on lot 4, block 7, of Elmer & Morrison's Rearrangement of Macalester Park, the lot being on the corner of Geneva and Amherst streets. Seventy-five feet to the north of this lot is Lincoln avenue, across which lies block 5 of the said Rearrangement, and in this block it appears that four abutters on Lincoln avenue are served by the respondent. Likewise the house on lot 3, block 8, immediately across Geneva street, is so served, and also a residence on lot 3, block 10, Macalester Park, diagonally across Amherst street from the relator's lot, and even in the relator's own block 7 a residence to the east of the relator's house is served. In addition to this, it appears that several other residences in the blocks immediately adjacent to block 7 are served; that the respondent actually has a pole and line less than three hundred feet west of the relator's lot, another within the same distance to the south, and a third about two hundred and fifty feet to the east; and that every alley in the blocks to the east, west, and south of block 7 contains one of the respondent's lines from which abutting lot owners are served, there being, however, no alley in block 7 and no line therein, except the individual service wire presumably necessary to connect the residence on lot 2 of this block with the respondent's line in the alley on which such lot abuts on the east. We think, therefore, that it is too clear for argument that the relator is within an established service zone, and, prima facie at least, entitled to the same service accorded to his neighbors.

2. The next question then is: Has the relator done all that he is called upon to do in order to invoke his right to equal service from the respondent?

"The law requires them," said the court in Chesapeake v. Baltimore, 66 Md. 399, speaking of telephone companies, "to be impartial and to serve all alike, upon compliance with their reasonable rules and regulations." It appears that the relator has had his house wired and equipped for the use of electricity, that he has made due appli-

cation for service, has followed this with a formal demand therefor, and now holds himself ready to comply with any and all lawful conditions that may be imposed by the respondent. Is this not all that is usually considered necessary to be done by one desiring service from a public service corporation of the class to which the respondent belongs?

It is a matter of common knowledge that when an application is made by an individual for service from such a company, such as for water, gas, electric light or power, or telephone service, certain things have to be done in order to connect the applicant's premises with the company's system, and we think that it is equally well known that the company, and not the applicant, usually attends to such matters, except in so far as they may be controlled by special rules and regulations applicable to the particular service. Now the respondent makes no claim that the relator has failed to comply with any of its special rules or regulations. It does not even appear that the respondent has any such. It admits the relator's application and demand, and that his house is equipped to receive the service, and yet refuses to furnish it, basing such refusal flatly and, aside from the question as to the effect of a provision of the franchise ordinance as to extensions, hereinafter considered, solely upon the ground that the relator has not procured for it a right of way to his premises.

More specifically stated, the claim is that, in order to reach the relator's premises without crossing private property belonging to others, a line must be strung across Amherst street and possibly Geneva street, and that probably a pole will have to be set in one of these streets; that the franchise ordinance makes the city's consent a condition precedent to the right to do these things or either of them; that no such consent has been obtained; and hence that the respondent cannot be compelled to furnish the service to the relator. The respondent's contention is that this consent must be obtained by the relator before he can insist upon being served by the respondent, or at least it must appear that the respondent has the right to string a wire over these streets and, if necessary, to set poles therein. In our view of the case, however, the obtaining of whatever consent that may be necessary in order to authorize the respondent to string

the wires and set the poles as above indicated, is a matter which must be attended to by the respondent and with which the relator has no direct concern. In other words, the consent of the city, if necessary, is merely one of the incidental details involved in the performance of the respondent's ultimate duty to furnish light to those properly applying therefor. These matters, as we have already noticed, are usually looked after by the public service companies, and not by the applicants for service.

More specifically it is a matter of common knowledge, and hence proper to be judicially noticed, that cities are divided by streets and alleys into blocks and subdivisions of blocks, the blocks and subdivisions thereof being very generally owned by private individuals and the streets and alleys being subject to a public use and under the police control of the municipality; that public service companies using wires for the distribution of the service supplied by them, such as telephone and electric-light companies, customarily set poles in the streets and alleys and string wires along and over and across the same; that such wires can be strung only a few hundred feet in any direction without crossing a street or an alley, even where the line is strung upon poles set upon a private right of way; that many persons are served by these wires or lines that are thus strung along and across the streets and alleys as above stated; and that when the consent of the city is necessary, in order that the company may lawfully set such poles and string such wires as may be necessary to carry the service to the persons so served or to be served, the company, and not its patrons or applicants for service, attends to the obtaining of such necessary consent by application to the council or otherwise, and it is to the company, and not to its numerous patrons, that the permission is granted and the permits issued.

Such, then, being the general custom, the question is at once suggested as to whether this custom was followed by the respondent in its dealings with its patrons generally throughout the city and particularly in the service zone involved in this case, or rather the question is whether there is any evidence in the case of a different custom; for in the absence of such evidence the general custom would be presumed to obtain, and the relator's prima facie case would, thus

far at least, remain unrebutted, the burden of establishing the different custom manifestly being upon the respondent after the relator's showing that he had complied with all the usual and customary conditions imposed upon applicants for service of this kind. But upon the record before us there can be but one answer to this question, for there is no suggestion in either the pleadings or the evidence to indicate that the respondent has ever followed any other than the general custom, or, until now, has ever attempted to place upon any of its patrons the burden of obtaining for it a right of way to their premises. On the contrary, there is evidence that it has followed the usual custom; for the resolution of permission, required by the franchise ordinance, to use the alleys in which the respondent's lines are strung in the service zone here involved, was directed to the Northern Heating and Electric Company, the respondent's predecessor, and not to its patrons, and the application to the commissioner of public works for permits in this same connection was also made by the respondent's predecessor and the permits were issued to the latter. There is, furthermore, evidence that such has been the regular custom of these two companies in obtaining such permits whenever needed.

In addition to this, it appears that the respondent's lines cross Amherst street, in this same service zone, twice, and it does not appear that any patron now being served was required to obtain the city's permission for such crossings. There was evidence that no permission was obtained specifically with regard to these crossings, and the relator attempted to introduce other evidence to the same effect. Such evidence was offered, however, solely for the purpose of showing that the city's consent was not necessary in order to legalize the stringing of wires across these streets—a question not material in our view of the case—and hence the propriety of the court's rejection of this evidence need not now be considered.

In the absence, then, of evidence of a contrary custom, it must be held, upon this record at least, that the respondent has not required other patrons and applicants to procure for it a right of way upon and across the streets necessarily used or crossed in carrying the service to them, and that such is not the respondent's usual custom.

And it follows that in requiring this of the relator the respondent has discriminated against him. Cincinnati v. Village, 57 Oh. St. 336; Snell v. Clinton, 196 Ill. 626. In the Ohio case above cited difference in rates was held to be discrimination, and in the Illinois case it was held that it was discrimination to require one applicant to pay for the converter used in connection with the service supplied to him, when other patrons were not subjected to similar charges.

We have not adverted to the feasibility of reaching the relator's premises by way of an underground conduit, although it appears that the consent of the city to this method of construction is not necessary under the terms of the franchise ordinance. Nor have we discussed the question of the respondent's right to employ its power of eminent domain in order to obtain a right of way over any private property that it may be necessary to cross in order to give the relator the service applied for by him, though it appears that by such a right of way the relator's premises could be reached from the respondent's nearest pole to the east thereof and less than two hundred fifty feet distant therefrom, without crossing any street or alley. With regard to these matters, it is sufficient to say that they are in the same category with the matter of right of way upon or across the streets with overhead wires. With the possibility or feasibility of any one or more of these methods of bringing the service to him, the relator has nothing to do; nor can he dictate the manner in which his premises are reached. These are matters which the respondent has the right to determine for itself, and must determine; and if each of these ways of carrying the service to the relator was barred by insurmountable difficulties, whether legal or physical or financial, the burden was upon the respondent to show such fact, and to sustain this burden there must, of course, be some showing of a bona fide attempt to reach the relator with the service and a failure thereof, or else proof of the futility of such an attempt. It affirmatively appears that the respondent has made no attempt to get permission to cross the street with its overhead wires, and there is no evidence of the nonfeasibility of an underground crossing. There is some evidence of an attempt to secure a right of way over private property, but it is wholly insufficient. Certainly the respondent cannot be allowed

to urge its failure to perform its incidental duty of at least attempting to obtain a right of way to the relator's premises, as a defense to its failure to perform its ultimate duty to furnish service.

3. The respondent's only other contention is that the relator has mistaken his remedy, in that his petition should have been addressed to the city council and not the court. Section 8 of the franchise ordinance, says the respondent, required the relator to make application to the city council to compel an "extension" of the respondent's lines; but we do not think that this section stands in the way of a writ to compel the respondent to do its duty, and this aside from any question as to whether such section conflicts with the respondent's statutory obligations. This section, after providing that "the grantee shall from time to time extend any of the electric lines which are now or may be hereafter maintained or operated under this franchise, for the conduct of electricity upon any street or portion of street in said city, within six months after being ordered so to do by the common council," provides further that the common council shall have no power to require such extension to be made unless there shall first be presented to it a petition signed by residents upon the street upon which the extension is to be made, and "provided further that there shall be an average of one of such houses or buildings for every one hundred feet of underground extensions so required to be made, exclusive of street crossings, and an average of one of such houses or buildings for every three hundred feet of overhead extensions, exclusive of street crossings," the months of December, January, February, March and April to be excluded "in computing the time within which such extensions must be made."

Assuming for the moment that this provision of the franchise ordinance affects the relations and the mutual rights and obligation of the company and its individual patrons, its effect upon the case before us would depend upon the meaning of the word "extension" as used therein. Counsel for the respondent assumes that the line necessary to reach the relator's premises would be an "extension;" but to this we cannot agree. We think it apparent that the relator's premises may be reached with a mere subsidiary line, and we are satisfied that such lines are not "extensions" within the purview of

section 8 of the ordinance. It would be an unwarranted construction of this section to hold that it requires every applicant for service within an established service zone to apply to the council in order to obtain service connections. The fact that in some cases the company could, under the terms of the ordinance, delay its compliance with an order for an "extension" eleven months, is alone sufficient to show the impracticability of any such construction of the word "extension." We are satisfied that section 8 of the ordinance referred to does not apply to mere subsidiary connections of consumers' premises with the respondent's system.

Furthermore, we think it apparent from the ordinance itself that section 8 has no application to the present case. Section 2 provides that the grantee shall within eighteen months from the date of its acceptance of the ordinance "construct and install the necessary poles, wires, conduits, conductors and other appurtenances so as to supply customers with electricity for use in all property and buildings that may desire the use thereof, along the streets of said city for a distance of at least five miles, and in addition to the requirements for extensions hereinafter contained, said grantee shall so construct and install at least an additional three miles each year for a period of two years," etc. Is it not manifest that the word "extension" as here used means extension of the system? So, also, section 4 provides that proper service shall be given "to all of its patrons along its entire system and all enlargements and extensions thereof." Besides section 8, these are the only other places in which the word "extension" occurs; and we think that, taking the three sections together, it is clear that section 8 contemplates extensions of the system or service zones, and does not purport to affect the sufficiency of the service within an established service zone.

But we do not think that section 8 of the ordinance was intended to affect the mutual rights and relations of the company and the individual consumers. Before this franchise ordinance was enacted the respondent's predecessor, and so the respondent, had no right whatever to maintain its system in the city of St. Paul. R. L. 1905, § 2927. Its right, therefore, to operate in the city is derived from the franchise ordinance, and by such ordinance such right is sub-

jected to certain conditions, among which is the provision of section 8, that the city may require "extensions" of the respondent's lines to meet the necessities of the natural growth and expansion of the city; but this condition is, in turn, qualified by the proviso that the city shall not require such "extensions" except upon the petition of a certain number of prospective patrons, and the sole purpose of this proviso is, we think, to protect the company from an unreasonable exercise of the otherwise arbitrary and unlimited right of the city, under the conditions imposed by the ordinance, to require "extensions," without regard to any benefit to the company. We do not deem it necessary to pass upon the question as to what extent the city could have relieved the company of its statutory duty to perform its functions as a public service corporation. We merely hold that by this ordinance no attempt has been made either to enlarge or restrict such duty. The ordinance simply gives permission to operate in the city, subject to certain conditions operative between the company and the city as such, and leaves untouched the duties of the company, as a public service corporation, to its patrons and applicants for service, except in so far as section 4 expressly declares the already existing duty of the company to furnish reasonable service without discrimination.

Aside from the effect of section 8 of the ordinance, mandamus is unquestionably the proper remedy; and since, as we have held above, this section is not applicable in the instant case, the respondent's contention that the relator has mistaken his remedy cannot be sustained.

It is but fair to the respondent to state that in the court below and also in this court, the respondent's position, as, in part, stated by it, is that, "if there is any possible way by which this court can issue this mandamus order and we can serve the plaintiff in this case, we are willing to comply with that order. We have no desire to deprive plaintiff of electric service which he requires." But such willingness, however much to be commended, is no defense, and was not, indeed, asserted as such. And the respondent having failed to meet the prima facie case made out by the relator, it follows that the relator is entitled to relief. Where the respondent in mandamus to compel the furnishing of a public service fails to establish its affirma-

tive defense, the relator, if he has made out a prima facie case, is entitled to the writ. Schmitt v. Edison, 110 N. Y. Supp. 44, 45; State v. Citizens, 61 S. C. 83. The trial court, therefore, erred in denying the relief sought, and the erroneous theory of the case which underlay such denial also manifestly led the court into the error of denying the relator's motion to amend findings 4, 7, 11 and 12, as prayed, for the matters sought by such requests for amendment to be injected into the findings were established by practically undisputed evidence, and were material to that theory of the case which seems to us to be the proper one, and pursuant to which we have reached the conclusions above indicated.

The relator is entitled merely to a writ—based upon amended findings as above stated—ordering the respondent to furnish him with electric service, within such reasonable time at the court below may fix, after hearing had for the determination of that question only, without direction as to manner in which the respondent shall perform its duty in such regard. State v. Board of Commrs. of Renville County, 83 Minn. 65, 69, 85 N. W. 830.

Order reversed with direction to proceed in accordance with this opinion.